**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 19-cr-10277-WGY** |
| | ) | |
| **JEFFREY KELLEM** | ) | |

## DEFENDANT'S EXPEDITED MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. §3582(c)(1)(A)

Defendant, Jeffrey Kellem, respectfully moves this Court for an order reducing his sentence based on the "extraordinary and compelling reasons" discussed below, pursuant to the recently amended 18 U.S.C. § 3582(c)(1)(A)(i). Mr. Kellem is 50 years old. As set forth in his Presentence Report at ¶ 68, he "suffers from several medical conditions including: prostate cancer; diabetes; GERD; fatty liver disease; sleep apnea; history of kidney stones; deviated septum; bilateral hearing loss; pelvic floor dysfunction; eczema and other dermatological issues; and a herniated disc. Records from Massachusetts General Hospital in Boston, Massachusetts, confirm the defendant's medical history." In October, 2018, he underwent surgery to remove his prostate and the need for chemotherapy or radiation treatment was being evaluated, and he was receiving treatment at Massachusetts General Hospital in Boston, MA and Newton Wellesley Hospital in Newton, MA. He takes several medications including medications to reduce his high blood pressure. He has suffered from obesity for several years and until incarceration received treatment for it.

Mr. Kellem is currently incarcerated in a BOP facility, F.C.I. Devens with presently one acknowledged, as of April 22, 2020, COVID-19 inmate (confirmed by a

nurse) and/or staff cases, but where there is inability to take sufficient protective measures, such as constant, consistent social distancing. This Court sentenced Mr. Kellem on December 4, 2019  to 42 months in custody concurrently on each of five counts, four for  wire fraud and one for filing false tax return. He was allowed to self-surrender on January 15, 2020, and did so. His scheduled release date is January 6, 2023. Accordingly, granting this order would reduce Mr. Kellem's sentence by two years, seven months. Should the Court grant this motion, Mr. Kellem has a stable residence at 49 Newbrook Circle, Newton, MA to return to live with his cousin, Eve Adler. Mr. Kellem, if at liberty, has ability to be employed, virtually if necessary, at Pilot, Inc. located at Boston, MA. He presumably would have health insurance coverage.

We respectfully ask the Court to consider this motion on an expedited basis.

## STATEMENT OF FACTS

On September 5, 2019, Mr. Kellem pled guilty to the five-count information charging him with four counts of wire fraud and one count of filing a false tax return. (Docket Entry No. 5.)  On September 4, 2020, the Court sentenced him to 42 months in prison and placed him on supervised release for 3 years on counts 1 through 4 and 1 year concurrent on count 5. (Docket Entry No. 24.). Mr. Kellem self-surrendered, pursuant to the Judicial Recommendation because of his many health problems, to F.C.I. Devens on January 15, 2020. (Docket Entry No. 24) His release date is January 6, 2023. This date does not take into account halfway house placement Mr. Kellem will  most likely get for a six month period of time. In counsel's experience, the bureau of prisons will most likely give Mr. Kellem 6 months of halfway house time, thereby moving up his release from prison to sometime in July or August 2022.

On April 13, 2020, Mr. Kellem, pursuant to his Inmate Request to Staff, filed his Inmate Request for Compassionate Release Consideration. A copy of both documents are attached hereto. In it, Mr. Kellem asked not only for compassionate release consideration but addressed the possibility of home confinement. On April 22, 2020, Mr. Kellem was notified that his request was denied and that he could pursue whatever administrative remedies are available to him.

## I.   The COVID-19 Crisis.

The novel coronavirus that causes COVID-19 has led to a global pandemic. As of April 13, 2020 there were more than 1,870,076 reported COVID-19 cases throughout the world and more than 22,146 deaths in the United States.[1] The number of COVID-19 cases in the United States is expected to grow exponentially. Projections range from 100,000 to 200,000 deaths in the United States in the best case scenario, to as many as 1.5 million deaths in the most severe scenario.[2]

New York is currently at the epicenter of the coronavirus pandemic.[3] On March 11, 2020, the World Health Organization declared COVID-19 to be a global pandemic. As of April 9, 2020, there were more than 149,401 positive cases in New York State

---

[1] https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299 423467b48e9ecf6 (last visited Apr. 13, 2020). These numbers rise significantly every day.

[2] See Dr. Deborah Birx Predicts Up To 200,000 Deaths "If We Do Things Almost Perfectly" NBC News, Mar. 30, 2020 https://www.nbcnews.com/news/us-news/dr-deborah-birx-predicts-200-000-deaths-if-we-do-n1171876 ;  Sheri Fink, Worst-Case Estimates for U.S. Coronavirus Deaths, New York Times (Mar. 13, 2020) https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html

[3] New York Becomes 'Epicenter' of Coronavirus Pandemic, Politico New York Health Care (March 25, 2020), at https://www.politico.com/states/new-york/newsletters/politico-new-york-health-care/2020/03/25/new-york-becomes-epicenter-of-coronavirus-pandemic-333669.

with more than 84,373 of those cases being in New York City.[4] As of April 9, there

have been 6,268 deaths in New York from COVID-19.[5] (New York health officials

estimate that the number of hospitalizations in New York State will double every two

days over the course of the next two to three weeks.[6] This reality has forced drastic

measures: On March 20, 2020, Governor Andrew Cuomo ordered 100 percent of all

non-essential workers to remain home, effectively shuttering New York State's entire

economy.[7]

  Massachusetts has been nearly as hard hit as New York.  Massachusetts Governor

Baker declared a state of emergency and has urged a stay at home request. The Supreme

Judicial Court on March 17, 2020 because of the pandemic, closed courthouses to the

public except to conduct emergency hearings. *Christie v. Commonwealth*, 484 Mass. 397,

399 (2020) As of the date of this writing, Massachusetts is expected to be at the peak of

the crisis. As of today, virus deaths have reached 1961. As of March 27, 2020, confirmed

COVID-19 cases in  MA totaled  39,643. www.wwlp.com/.../covid-19-deaths-in-

---

[4] See New York State website, available at https://coronavirus.health.ny.gov/county-county-breakdown-positive-cases.

[5] See COVID-19 Tracker, available at https://www.bing.com/covid/local/newyork_unitedstates and New York State, Department of Public Health,  https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n

[6] *Coronavirus Map:  Tracking the Global Outbreak*, New York Times (Mar. 25, 2020) available at https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html

[7] Keshia Clukey and Henry Goldman, *Cuomo Orders 100% of Nonessential N.Y. Workforce to Stay Home*, Bloomberg News (Mar. 20, 2020), available at https://www.bloomberg.com/news/articles/2020-03-20/n-y-gov-cuomo-100-percent-of-workforce-must-stay-home.

massachusetts. On April 21, the Governor of Massachusetts closed all schools until September, 2020 and social gatherings are strongly disapproved, hence restaurants, movies and other places of public congregation are closed. The Supreme Judicial Court has implemented a plan to try to increase the numbers of inmates to be released. On April 3, 2020, the Supreme Judicial Court held that the risks inherent in the COVID-19 pandemic constitute a changed circumstance within the meaning of Mass. Gen. Laws Ann. ch. 276, § 58, tenth par., and the provisions of Mass. Gen. Laws Ann. ch. 276, § 57 and, as such, to decrease exposure to COVID-19 within correctional institutions, any individual who was not being held without bail under Mass. Gen. Laws Ann. ch. 276, § 58A, and who was not charged with an excluded offense was entitled to a rebuttable presumption of release. *Committee for Public Counsel Services v. Chief Justice of the Trial Court*, 484 Mass. 431 (2020). See also *Commonwealth v. Utley*, where a Single Justice of the Supreme Judicial Court (Cypher, J.) affirmed a trial judge's decision to release a man charged with murder who is undergoing cancer treatments because his treatments place him at high risk of COVID-19 infection. *Commonwealth v. Utley*, Docket No. SJ-2020-0141.

As surely as New York State is the current epicenter of the crisis, and Massachusetts runs a close second,  state and federal prison systems located in New York and Massachusetts are uniquely vulnerable. Prisons are environments, much like cruise ships or nursing homes, in which the COVID-19 virus can easily gain a foothold and, when it does, spread rapidly. *See* Craig McCarthy, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* N.Y. Post (Mar. 19, 2020) ("[W]e cannot change the fundamental nature of jail. We cannot socially distance dozens of elderly men living in a dorm, sharing a bathroom. Think of a cruise ship recklessly boarding more passengers each day. . . . Please let as many out as you possibly can."); Jennifer Grannerman, *A*

*Rikers Island Doctor Speaks Out to Save Her Elderly Patients from the Coronavirus*, The New Yorker (Mar. 20, 2020); Megan Flynn, *Top Doctor at Rikers Island Calls the Jail a 'Public Health Disaster Unfolding Before Our Eyes'* Washington Post, (Mar. 31, 2020).

Virtually all of the precautionary measures are designed to keep people out of crowded places and to require "social distancing" to lessen the spread of the virus because it is highly contagious. The virus passes through coughing and by contact with surfaces. It "can remain viable and infectious in aerosols for hours and on surfaces up to days."[8] However, the recommended measures for mitigating the spread of COVID-19 are not readily available for incarcerated inmates or those who must interact with them. Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. Current CDC recommendations are for gatherings of no more than 10 people and that each person should remain at a distance of at least six feet from every other person, although some health professionals are now advocating twelve feet distancing.[9] Implementing this guidance in congregate settings where people must share sleeping areas, dining halls, bathrooms, showers and other common areas, is often difficult, if not impossible. In addition to the increased opportunities for transmission,

---

[8] Neeltje van Doremalen, et. al, Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1, New England J. Med., (March 17, 2020), available at nejm.org/doi/10.1056/NEJMc2004973.

[9] Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission, Center for Disease Control and Prevention, 3 (Mar. 12, 2020) available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf.  See also Lisa Maragakis, "Coronavirus, Social Distancing, and Self-Quarantine," John Hopkins Univ. (last accessed March 21, 2020) https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine.

there are reduced opportunities to apply necessary hygiene measures, as jails and

prisons are often under resourced and ill-equipped.

The Supreme Judicial Court in *Christie v. Commonwealth, supra,* recognized the

dangers of COVID-19 in persons suffering from illnesses that Mr. Kellem displays. It

said:

> *COVID-19*. COVID-19 is a respiratory illness caused by a novel coronavirus.
> While some patients with COVID-19 develop mild respiratory illness, others
> develop severe complications, such as pneumonia in both lungs, multi-organ
> failure, and in some cases death. COVID-19 is a particular risk to older adults and
> to individuals with underlying health conditions, such as cardiovascular  disease,
> diabetes, and chronic respiratory disease.
> Prevention of COVID-19 is highly dependent on physical social distancing (i.e.,
> remaining at least six feet apart from other people), as well as frequent hand-
> washing and sanitizing. Persons who have been exposed to someone who has or
> may have COVID-19 have been asked by international, Federal, and State
> authorities to self-isolate for at least two weeks following the potential exposure
> in order to slow the spread of the virus.

Recognizing the difficulties to safe incarceration posed by COVID-19, in New

York City Mayor Bill de Blasio "has been pushing prosecutors and judges to release as

many inmates as possible, after dire warnings from public defenders and jail health

officials about the toll the disease could take inside lockups." *See* Jan Ransom and Alan

Feuer, *'We're Left for Dead': Fears of Virus Catastrophe at Rikers Jail*, New York

Times (Mar. 30, 2020). *See also* Bernadette Hogan, *Cuomo Orders 1,100 Parole*

*Violators Released from Jails Over Coronavirus Concerns*, N.Y. Post (Mar. 27, 2020).

Although hundreds of inmates in New York City jails have been released, the rate of

infection has continued to climb.[10]

---

[10] For example, as of April 8, 2020 287 inmates and 441 employees inside the New York
City Department of Correction system have tested positive, which "yields a rate of
infection within the city's correctional system of 6.6 percent, more than seven times
higher than that of New York City at large and nine times higher than New York State."

The federal prison system is not immune, as many voices in Congress have recognized.[11] Our nation's jails and prison systems do not provide adequate medical care in the best of times, and the federal system is no exception.[12] As of April 13, 2020,

---

See Asher Stockler, More Than 700 People Have Tested Positive for Coronavirus on Riker's Island, Including Over 440 Staff, Newsweek (Apr. 8, 2020) available at https://www.newsweek.com/rikers-island-covid-19-new-york-city-1496872.

[11] Legislators have been calling on the Department of Justice to "do all they can to release as many people as possible who are currently behind bars and at risk of getting sick." *See* March 19, 2020 Letter from U.S. Reps. Jerrold Nadler & Karen Bass to Attorney General William P Barr ("With large numbers of people living in close proximity to one another, many of them elderly or living with chronic diseases, DOJ must act now to save lives. Accordingly, we urge you to put in place measures to ensure that both the flow of prisoners into federal facilities is slowed significantly and that prisoners who can and should be released are released forthwith. We cannot wait any longer to take action."); *see also* March 19, 2020 Letter from Senator Kathleen Harris to BOP Director Michael Carvajal (noting that "[e]merging research has demonstrated how dangerous coronavirus is for the elderly and those with underlying conditions and compromised immune systems" and urging BOP to "tak[e] reasonable steps to reduce the incarcerated population and guard against potential exposure to coronavirus") Available at https://www.harris.senate.gov/imo/media/doc/Harris%20Letter%20to%20Carvajal%20(3.19).pdf

[12] *See* U.S. Dep't of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Mar. 2016), https://oig.justice.gov/reports/2016/e1602.pdf (finding that the BOP experienced chronic medical staff shortages and failed to take adequate measures to address them, leading to problems meeting the medical needs of prisoners, requiring the use of outside hospitals, and endangering the safety and security of institutions); U.S. Dep't of Justice Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (Rev. Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf (finding that BOP facilities and services, including medical services, were inadequate to meet the needs of an aging prison population leading to delays in medical treatment for prisoners with acute and chronic heart and neurological conditions, who wait an average of 114 days to see medical specialists.); David Patton, *Statement from Federal Defenders of New York*, Federal Defenders of New York (Mar. 8, 2020), https://federaldefendersny.org/about-us/news/statement-from-federal-defenders-of-new-york.html.

10 federal inmates within the BOP system have already died.[13] As of April 13, 2020 the Bureau of Prisons website confirms that 352 federal inmates and 189 staff members have tested positive for COVID-19.[14] In addition BOP informed congressional staff at an April 7, 2020 briefing that they had the following "open" cases, which they defined as "suspected, presumed positive, or clinically confirmed":

- 456 people in isolation (symptomatic, but not necessarily tested);
- 3,850 inmates in quarantine (as of April 7)
- 192 quarantined at RRCs (as of April 7).[15]

However, there are significant reasons to believe that even these numbers drastically underestimate the scope of the problem, as testing is not generally available inside the prison system. A union representing BOP staff has filed an "imminent danger report" with the United States Department of Labor Occupational Safety and Health Administration ("OSHA") alleging that the BOP is engaging in actions which are proliferating the spread of COVID-19 including a) directing staff who have come into contact with individuals who show systems of COVID-19 to report to work and not self-quarantine; failing to introduce workplace controls to mitigate or prevent exposure or further exposure to the virus; failing to modify operations to minimize contact; and failing to provide staff with the proper masks to staff. *See* Joe Davidson, *Unions for*

---

[13] *See* Keegan Hamilton, *Third Inmate Dies from COVID-19 at Louisiana Prison as Entire Federal System Goes on Lockdown*, Vice News (Apr. 2, 2020) available at https://www.vice.com/en_us/article/5dmend/second-inmate-dies-from-covid-19-at-louisiana-prison-as-entire-federal-system-goes-on-lockdown *See also* Kimberly Kindy, An Explosion of Coronavirus Cases Cripples a Federal Prison in Louisiana, Washington Post (Mar. 29, 2020).

[14] https://www.bop.gov/coronavirus/ (last visited Apr. 13, 2020). BOP reports that 40 BOP facilities and 9 RRCs nationwide have been affected. *Id.*

[15] Information regarding the briefing provided by BOP to Congressional staff on April 7 was information provided by Federal Defender Sentencing Resource Counsel.

*Prison, VA Workers File 'Imminent Danger" Reports about Coronavirus Condition*s,
Washington Post, (Apr. 9, 2020).[16]

**Conditions at FCI Devens.**

Mr. Kellem submits this data from the complaint in Grinis et al v. Spaulding, et al
1:20-cv-10738-GAO, ¶¶ 68-  a copy of which is attached as an exhibit hereto.

### The Camp

The Camp houses mostly non-violent prisoners serving relatively short
sentences and/or prisoners who are nearing their release dates.

In the Camp at FMC Devens, it is impossible for prisoners, like Grinis,
to stay at least six feet away from other prisoners and, therefore, to engage in
effective social distancing, as the CDC has recommended. The conditions described
below have persisted even after FMC Devens reportedly went into a "modified
lockdown."

Camp prisoners occupy a common, dormitory-style space that is divided into
open cubicles that measure approximately 7 by 9 feet. The cubicles have no doors,
and their dividing walls do not extend to the ceiling.

Camp prisoners sleep in two-person bunk beds: most cubicles contain two
bunk beds (sleeping 4 prisoners); some contain one bunk bed (sleeping 2 prisoners).

Camp prisoners are responsible for cleaning their own cubicles. These
shared living spaces are not regularly and properly disinfected to prevent the
spread of COVID-19.

---

[16] A copy of the report is available at
https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-form-national-complaint.pdf.

Camp prisoners share 12 common toilets, sinks, and showers.

Camp prisoners are assigned to clean these facilities twice per day, and they are often unsanitary. The common toilets, sinks, and showers are not regularly and properly disinfected to prevent the spread of COVID-19.

At mealtimes, Camp prisoners stand close together while waiting in line to be served, and they eat together in a common area at communal tables. Neither the serving area nor the communal tables in the Camp are regularly and properly disinfected.

Camp prisoners share 4 common telephones and 5 common computers, all of which are clustered closed together. These devices are not cleaned or disinfected after each prisoner uses them.

Camp prisoners work in various buildings and areas throughout FMC Devens, where they have contact with other prisoners and staff. No accommodation is made for social distancing while cleaning facilities, operating laundry, serving food, or doing other assigned tasks.

Camp prisoners have received no education regarding COVID-19 or guidance about reducing the risk of infection.

Since early April, staff have encouraged Camp prisoners to wear masks, but the institution provides only 3 masks per month and has given no instructions about using or maintaining those masks. Prisoners have also been encouraged to wash their hands frequently.

In the Camp, many but not all staff have recently started to wear masks, but they rarely wear gloves or other personal protective equipment.

New prisoners continue to enter the Camp. Petitioners do not know if new arrivals are being tested or quarantined upon intake.

Mr. Kellem confirms the above but in addition reports the inadequacy of cleaning supplies.

Mr. Kellem further reports that he is a chef at the institution and that he cannot maintain social distancing either while preparing large quantities of food among other food preparers or when serving inmates their food.

## LEGAL ARGUMENT

18 U.S.C. § 3582(c)(1)(A) permits a defendant to file a motion with the Court following an adverse determination of an inmate's request that the BOP file a motion to modify the inmate's sentence, or 30 days from BOP's receipt of a request that it file such a motion. On April 13, 2020,  Mr. Kellem's request to the warden of FCI Devens was filed. On April 22, 2020 counsel received oral communication from his client that his request has been denied. In light of the time-sensitive nature of this application, Mr. Kellem is filing this motion now so that the Court has an opportunity to review the matter as quickly as possible.

I.     **This Court Has The Authority to Resentence Mr. Kellem Under 18 U.S.C. § 3582(c)(1)(A)(i) for the "Extraordinary and Compelling Reasons" Created By The COVID-19 Pandemic and the Prison Conditions Which Prevent Self-Care for a High-Risk Patient.**

Recent changes to the statutory language of 18 U.S.C. § 3582 provide new jurisdiction to federal courts to grant release for extraordinary and compelling reasons. Federal courts may reduce a prisoner's sentence under the circumstances outlined in 18 U.S.C. § 3852(c). Under § 3852(c)(1)(A)(i), a court may reduce a prisoner's sentence "if

it finds that" (1) "extraordinary and compelling reasons warrant such a reduction" and (2) the reduction is "consistent with applicable policy statements issued by the Sentencing Commission."

Prior to 2018 only the Director of the Bureau of Prisons ("BOP") could file these kinds of "compassionate-release motions." *United States v. Brown*, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019).[17] The BOP rarely did so. Although the BOP was first authorized to file compassionate-release motions in 1984, from 1984 to 2013, an average of only 24 inmates were released each year through BOP-filed motions. *See* Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice). According to a 2013 report from the Office of the Inspector General, these low numbers resulted, in part, because the BOP's "compassionate release program had been poorly managed and implemented inconsistently, . . . resulting in eligible inmates . . . not being considered for release, and terminally ill inmates dying before their requests were decided." *Id*. The report also found that the BOP "did not have clear standards as to when compassionate release is warranted and . . . BOP staff therefore had varied and inconsistent understandings of the circumstances that warrant consideration for compassionate release." *Id*.

Against this backdrop, Congress passed and President Trump signed the First

---

[17] The Comprehensive Crime Control Act of 1984 first included the so-called "compassionate release statute" which allowed for a district court to modify a final term of imprisonment after finding the existence of "extraordinary and compelling reasons" only upon motion by the Director of the Bureau of Prisons ("BOP"). 18 U.S.C. § 3582(c)(1)(A)(i); see also P.L. 98-473, 98 Stat 1837 (Oct. 12, 1984). Without such motion, district courts were unable to reduce a prisoner's sentence, even if it concluded that extraordinary and compelling reasons existed to do so. The BOP served as a gatekeeper to a prisoner's road to potential relief and limited the sentencing court's jurisdiction.

Step Act in 2018, a landmark piece of criminal-justice reform legislation that "amend[ed] numerous portions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration." *Brown*, 411 F. Supp. 3d at 448 (citing Cong. Research Serv., R45558, *The First Step Act of 2018: An Overview* 1 (2019)). In an effort to improve and increase the use of the compassionate-release process, the First Step Act amended § 3852(c)(1)(A) to allow prisoners to directly petition courts for compassionate release, removing the BOP's exclusive "gatekeeper" role.[18]

The amendment to § 3852(c)(1)(A) provided prisoners with two direct routes to court: (1) file a motion after fully exhausting administrative appeals of the BOP's decision not to file a motion, or (2) file a motion after "the lapse of 30 days from the receipt . . . of such a request" by the warden of the defendant's facility, "whichever is earlier." 18 U.S.C. § 3852(c)(1)(A). These changes gave the "district judge . . . the ability to grant a prisoner's motion for compassionate release even in the face of BOP opposition or its failure to respond to the prisoner's compassionate release request in a timely manner." *United States v. Young*, 2020 WL 1047815, at *5 (M.D. Tenn. Mar. 3, 2020). The substantive criteria of § 3582(c)(1)(A)(i) remained the same.

Congress never defined the term "extraordinary and compelling reasons," except to state that "[r]ehabilitation . . . alone" does not suffice. 18 U.S.C. § 994(t). Rather, Congress directed the Sentencing Commission to define the term. *Id*. The Commission did so prior to the passage of the First Step Act, but has not since updated the policy

---

[18] *See also United States v. Redd*, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020) ("The First Step Act was passed against the backdrop of documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants."); 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Senator Cardin, co-sponsor of the First Step Act) ("[T]he bill expands compassionate release . . . and expedites compassionate release applications.").

statement. *See* U.S.S.G. §1B1.13 cmt. n.1(A)-(D). In subsections (A)-(C) of an Application Note to U.S.S.G. §1B1.13, the Commission enumerated three specific "reasons" that qualify as "extraordinary and compelling": (A) terminal illness diagnoses or serious medical, physical or mental impairments from which a defendant is unlikely to recover, and which "substantially diminish" the defendant's capacity for self-care in prison; (B) aging-related health decline where a defendant is over 65 years old and has served at least ten years or 75% of his sentence; or (C) two family related circumstances: (i) death/incapacitation of the only caregiver for the inmate's children or (ii) incapacitation of an inmate's spouse, if the inmate is the spouse's only caregiver. *See id.* cmt. n.1(A)-(C). The policy statement also added a catchall provision that gave the Director of the BOP the authority to determine if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with" the other three categories. *Id.* cmt. n.1(D).

Thus, implicitly recognizing that it is impossible to package all "extraordinary and compelling" circumstances into three neat boxes, the Commission made subsections (A)-(C) non-exclusive by creating a catchall that recognized that other "compelling reasons" could exist. *See United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) (noting that §1B1.13 never "suggests that [its] list [of criteria] is exclusive"); *United States v. Beck*, 2019 WL 2716505, at *8 (M.D.N.C. June 28, 2019) ("Read as a whole, the application notes suggest a flexible approach . . . [and] recognize that the examples listed in the application note do not capture all extraordinary and compelling circumstances.").

The Commission has not updated its policy statement to account for the changes

imposed by the First Step Act,[19] and the policy statement is now clearly outdated. The very first sentence of §1B1.13 constrains the entire policy statement to motions filed solely by the BOP. And an Application Note also explicitly confines the policy statement to such motions. See U.S.S.G. §1B1.13 ("Upon motion of the Director of the [BOP] . . . the court may reduce a term of imprisonment . . . ."); *id.* at cmt n.4 ("A reduction under this policy statement may be granted only upon motion by the Director of the [BOP]."); see also *Brown* at 449 (describing the old policy statement as "outdated," adding that the Commission "has not made the policy statement for the old [statutory] regime applicable to the new one."); *United States v. Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. 2020) (describing the old policy statement as "at least partly anachronistic").

Accordingly, a majority of district courts, including district courts within the First Circuit, have concluded that the "old policy statement provides helpful guidance, [but] . . . does not constrain [a court's] independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3852(c)(1)(A)." *United States v. Beck*, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019); *see also Brown*, 411 F. Supp. 3d at 451 ("[T]he most natural reading of the amended § 3582(c) . . . is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it."); *United States v. Fox*, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("[D]eference to the BOP no longer makes sense now that the First Step Act has reduced the BOP's role. I

---

[19] As several courts have recognized, the Commission is unable to update the Sentencing Guidelines because, at the moment, it lacks a sufficient number of appointed commissioners to take this action. *See, e.g., United States v. Maumau*, No. 08-cr-00785, 2020 WL 806121, at *1 n.3 (Feb. 18, 2020).

treat the previous BOP discretion to identify other extraordinary and compelling reasons

as assigned now to the courts."); *United States v. Bucci,* 409 F.Supp. 1, 2 (D. Mass.

2019) (following *Fox* and holding that "the Commission's existing policy statement

provides helpful guidance on the factors that support compassionate release, although it

is not ultimately conclusive"); *United States v. Redd*, 2020 WL 1248493, at *7 (E.D.

Va. Mar. 16, 2020) ("Application Note 1(D)'s prefatory language, which requires a

[catchall] determination by the BOP Director, is, in substance, part and parcel of the

eliminated requirement that relief must be sought by the BOP Director in the first

instance. . . . [R]estricting the Court to those reasons set forth in §1B1.13 cmt. n.1(A)-

(C) would effectively preserve to a large extent the BOP's role as exclusive gatekeeper,

which the First Step Act substantially eliminated . . . ."); *United States v. Young*, 2020

WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) ("[T]he dependence on the BOP to

determine the existence of an extraordinary and compelling reason, like the requirement

for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent

with the amendments implemented by the First Step Act."); *Maumau*, 2020 WL at *2-

*3 (D. Utah Feb. 18, 2020) (collecting cases).[20]

Thus Court has discretion to assess whether Mr. Kellem presents "extraordinary

and compelling reasons" for his release outside those listed in the non-exclusive criteria

of subsections (A)-(C) of the pre-First Step Act policy statement. *See* Memorandum,

*United States v. Jeremy Rodriguez*, 03-cr-00271-AB-1 (E.D.P.A. Apr. 1, 2020), at 12

---

[20] A smaller number of courts have concluded that the Sentencing Commission's policy
statement prevents district courts from considering any "extraordinary and compelling
reasons" outside of those listed in subsections (A)-(C) of the policy statement. *See, e.g.,
United States v. Lynn*, 2019 WL 3805349, at *2-*5 (S.D. Ala. Aug. 12, 2019); *United
States v. Shields,* 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019); *United States v.
Willingham*, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019).

(granting compassionate release due to COVID-19 and holding that the Court had

discretion to assess whether the defendant presented "extraordinary and compelling

reasons" for his release outside of those listed in the non-exclusive criteria of

subsections (A)-(C) of the policy statement and citing *Fox*, 2019 WL 3046086, at *3

for the proposition that "the Commission's existing policy statement provides helpful

guidance on the factors that support compassionate release, although it is not ultimately

conclusive . . . ."); *United States v. White,* 00-30027-MGM (D. Mass. April 10,

2020)(granting compassionate release, waiving exhaustion requirement, for 52 year old

inmate being held at MDC Brooklyn with no significant underlying health issues).

## II.      Extraordinary and Compelling Reasons Exist Here.

Mr. Kellem's circumstances – particularly the outbreak of COVID-19, his

underlying medical conditions that place him at high risk should he contract the disease,

the fact that COVID-19 has already made its way into FCI Devens coupled with the fact

that the conditions at FCI Devens are conducive to the spread of the virus are

"extraordinary and compelling" reasons to reduce his sentence.

As a 50 year old who suffers from diabetes, prostate cancer, obesity and

hypertension, Mr. Kellem is a vulnerable inmate. First, it is clear that coronavirus

risks increase with age.[21] More importantly individuals with diabetes and

hypertension are at heightened risk. An early World Health Organization report on

COVID-19 found that "[i]ndividuals at highest risk for severe disease and death

include people . . . with underlying conditions such as hypertension [and]

---

[21] *See* New Coronavirus Study Reveals Increased Risks from Middle Age, The Guardian
(Mar 30, 2020) ("Our analysis very clearly shows that at age 50 and over, hospitalization
is much more likely than in those under 50, and a greater proportion of cases are likely to
be fatal.")

diabetes."[22] While the preliminary overall fatality rate in the report was 3.8%, the fatality rate for people with diabetes was 9.2%. The fatality rate for people with hypertension was 8.4%. *Id.* Recent New York statistics show that the two most common co-morbidities were hypertension and diabetes.[23]

Recent articles by doctors address the conditions of diabetes and obesity and the relationship of those medical conditions to COVID-19.[24]See Affidavit of Dr. Steven Edelman, M.D. attached hereto as an Exhibit; CV of Dr. Edelman attached hereto as an exhibit; manuscript: "Obesity in Patients Younger than 60 Years is a Risk Factor in COVID-19 hospital Admissions" attached hereto as an exhibit ; Article of Dr. Violete Raverdy titled: "High prevalence of obesity in severe acute respiratory syndrome coronavirus-2 (SARS CoV-2) requiring invasive mechanical ventilation," attached hereto as an exhibit.

In a recent decision granting compassionate release to an inmate in very similar circumstances to Mr. Kellem, Judge Anita Brody of the Eastern District of Pennsylvania found that the inmate's diabetes, high blood pressure and liver abnormalities constituted "compelling reasons," despite the fact that the BOP classified him at the lowest care level and that the government argued that his

---

[22] Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 24, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.

[23] https://www.usatoday.com/story/news/health/2020/04/07/new-york-coronavirus-deaths-data-shows-most-had-underlying-illnesses/2960151001/ ("And 4,089 of those who died had at least one other chronic disease, the records showed: The leading underlying illness was hypertension, which showed up in 55% of the deaths. Next was diabetes, which was diagnosed in 1,755 deaths, or about 37% of the cases. Other top illnesses found in those who died from coronavirus were hyperlipidemia; coronary artery disease; renal disease and dementia.").

[24] Letter of American Diabetes Association to Detention Centers.

conditions were not unusual: "In the absence of a deadly pandemic that is deadlier

to those with [the defendant's] underlying conditions, these conditions would not

constitute 'extraordinary and compelling reasons.' It is the confluence of COVID-

19 and [the defendant's] health conditions that makes this circumstance

extraordinary and compelling." *See* Memorandum, *United States v. Jeremy*

*Rodriguez*, 03-cr-00271-AB-1 (E.D.P.A. Apr. 1, 2020), at 15; Similarly, Judge

Analisa Torres of the Southern District of New York granted compassionate release

to an inmate in similar circumstances to Mr. Ramirez – incarcerated at the MDC.

*See United States v. Perez*, 2020 WL 1546422 (S.D.N.Y. Apr. 1, 2020)

("extraordinary and compelling reasons" demonstrated by client's medical

condition, combined with the limited time remaining on his prison sentence, and

the high risk in the MDC posed by COVID-19"). Other courts have also found that

COVID-19 presents an extraordinary and compelling reason. *See United States v.*

*Muniz,* 2020 WL 1540325 (Mar. 30, 2020) (granting compassionate release to

inmate with end stage renal disease, diabetes, and arterial hypertension and noting

that "while the Court is aware of the measures taken by the Federal Bureau of

Prisons, new reports of the virus's spread in detention centers within the United

States and beyond our borders in China and Iran demonstrate that individuals

housed within our prison systems nonetheless remain particularly vulnerable to

infection."); *United States v. Campagna*, 2020 WL 1489829 (S.D.N.Y. Mar. 27,

2020) (holding that Defendant's compromised immune system, taken in concert

with the COVID-19 public health crisis, constitutes an extraordinary and

compelling reason to modify to Defendant's sentence); *United States v. Jepsen,*

2020 WL 1640232 at *5 (D. Conn. Apr. 1, 2020) (inmate who is immunocompromised and suffers from multiple chronic conditions demonstrated "extraordinary and compelling" circumstances); *United States v.Resnick*, 2020 WL 1651508 (S.D.N.Y. Apr. 2, 2020) (inmate with diabetes and end-state liver disease demonstrated "extraordinary and compelling circumstances"); *United States v. Zuckerman*, 2020 WL 1659880 at *5 (S.D.N.Y. Apr. 3, 2020) (Zuckerman's age combined with his diabetes, hypertension and obesity satisfy the "extraordinary and compelling reasons" requirement); *United States v. White,* 00-30027-MGM (D. Mass. April 10, 2020)(granting compassionate release, waiving exhaustion requirement, for 52 year old inmate being held at MDC Brooklyn with no significant underlying health issues).

## II.  This Court Can Waive the 30-Day Requirement for Exhaustion of Administrative Remedies Under 18 U.S.C. § 3582(c)(1)(A) Because of the Urgent Risk of Fatal Infection.

Mr. Kellem filed his petition with the warden via counsel on April 13, 2020. See Exhibit. Under section 3582(c)(1)(A), Mr. Kellem would ordinarily be required to either wait 30 days following the warden's receipt of his compassionate release request, or exhaust all administrative remedies prior to approaching the Court, whichever happens earlier. *See* 18 U.S.C. § 3582(c)(1)(A). However, the Court may waive these administrative exhaustion requirements, and should do so here, as it has done in a similar case. *See, e.g., United States v. Ramirez,* 1:17-cr-10328-WGY, Docket No. 115 (D. Mass. April 20, 2020*)*(entry stating that it was proper "to waive the 30 day exhaustion requirement) *; United States v. Guzman Soto,* 1:18-cr-10086-IT, Docket No. 48 (D. Mass. April 17, 2020)( holding that a defendant does not need

to exhaust all of his/her administrative remedies and that the 30 day waiting period

may be waived); *United States v. Perez*, 2020 WL 1546422 (S.D.N.Y. Apr. 1, 2020)

(holding that client's undisputed fragile health, combined with the high risk of

contracting COVID-19 in the MDC, justifies waiver of the exhaustion requirement);

*United States v. McCarthy*, 2020 WL 1698732 (D. Conn. Apr. 8, 2020) (exhaustion

would be futile for inmate at MDC Brooklyn who had 26 days remaining of

imprisonment and suffers from chronic obstructive pulmonary disease and asthma).

     Typically a prisoner seeking to alter his conditions of imprisonment generally

must exhaust administrative remedies before resorting to judicial intervention, but the

Court may waive that prerequisite. The First Step Act did not alter this longstanding

precedent—both the administrative exhaustion procedure and the circumstances meriting

its waiver remain unchanged. *See, e.g., United States v. Bolino*, No. 06-CR-0806 (BMC),

2020 WL 32461, at *1 (E.D.N.Y. Jan. 2, 2020) (under the First Step Act, "the same

exhaustion procedure for routine administrative grievances . . . applies to requests for

compassionate release."). Indeed, courts throughout the country have continued to waive

the administrative exhaustion requirements under the First Step Act, where circumstances

warrant. *See Washington v. Bur. of Prison*s, No. 1:19-CV-01066, 2019 WL 6255786, at

*2 (N.D. Ohio July 3, 2019) (in addressing motion for recalculation of good time credit

under the First Step Act, the court explained that "[t]he failure to exhaust administrative

remedies may be excused if seeking administrative remedies would be futile."); *United*

*States v. Walker*, No. 3:10-cr-00298-RRB-1, [Dkt. 110] (D. Or. Feb. 7, 2019) (finding

that, although the defendant failed to exhaust administrative remedies, the Court had

jurisdiction to order recalculation of defendant's good time credit under the First Step Act

and to order defendant's release if his term of imprisonment had expired); see also *Gurzi v. Marques*, No. 18-CV-3104-NEB-KMM, 2019 WL 6481212, at *2 (D. Minn. Oct. 10, 2019) (despite prisoner's failure to exhaust administrative remedies, addressing the merits of prisoner's objections to his designation, in part under the First Step Act, as "the Court observes that it has the authority to proceed to the merits of the case rather than rely on a failure to exhaust when appropriate."); *United States v. White,* 00-30027-MGM (D. Mass. April 10, 2020)(granting compassionate release, waiving exhaustion requirement, for 52 year old inmate being held at MDC Brooklyn with no significant underlying health issues)[25]

The futility and potentially irreparable harm of requiring Mr. Kellem to wait a minimum of 30 days to exhaust his administrative remedies are manifest. Mr. Kellem seeks this emergency relief to avoid contracting COVID-19 at FCI Devens where he has a high risk of infection: "social distancing" is impossible in the crowded facility, and soap, hand sanitizer and disinfectant products are, at times, in low supply or unavailable. Waiting for Mr. Kellem to exhaust his administrative remedies would only increase his risk of exposure to COVID-19.  Should he contract the virus while waiting for an administrative response any remedy will come too late—Mr. Kellem will be in mortal danger, causing him potentially irreparable physical harm, and rendering this compassionate release request utterly moot.  *See, e.g., Sorbello v. Laird*, No. 06 CV 948

---

[25] Nor is there a colorable argument that the exhaustion requirement under the First Step Act is jurisdictional.  Like the administrative exhaustion requirements applicable to § 2241 petitions, and under the PLRA, § 3582(c)(1)(A) "lacks the sweeping and direct language that would indicate a jurisdictional bar rather than a mere codification of administrative exhaustion requirements."  *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir. 2003) (quotation marks and citations omitted); *see also Atkinson v. Linaweave*r, No. 13 CIV. 2790 JMF, 2013 WL 5477576, at *1 (S.D.N.Y. Oct. 2, 2013) ("In a case brought pursuant to Section 2241, exhaustion . . . does not go to the Court's jurisdiction to adjudicate the dispute").

(JG), 2007 WL 675798, at *3 n.8 (E.D.N.Y. Feb. 28, 2007) (refusing to dismiss petition requesting designation to halfway house "for failure to exhaust administrative remedies" where delay in processing administrative remedies would "result in the irreparable harm of late designation to community confinement"); *Pimentel v. Gonzales*, 367 F. Supp. 2d 365, 371 (E.D.N.Y. 2005) (addressing merits of request for designation to halfway house, where "not only would an administrative appeal be futile, but without immediate relief by this court, Pimentel could suffer irreparable harm," as "[w]ere Pimentel required to pursue administrative remedies prior to bringing this action, he would likely be done serving much, if not all of his entire sentence such that his request would become moot.").

In *Perez*, the client submitted his BOP application for sentence modification on March 26 and the Court granted his motion on April 1. Although acknowledging that a number of courts have denied applications for sentence modification under 3582(c)(1)(A) brought on the basis of the risk posed by COVID-19 on the ground that the defendant failed to exhaust his administrative remedies, the Court noted that "in several of those cases, the defendant was not in a facility where COVID-19 was spreading, and in none of them did the defendant present compelling evidence that his medical condition put him at particular risk of experiencing deadly complications from COVID-19. In this case, unlike those, Perez has established that enforcing the exhaustion requirement carries the real risk of inflicting severe and irreparable harm to his health." *Perez*, 2020 WL 1546422 at *3 n.3. Noting that Perez had limited time on his sentence, the Court held that pursuing the administrative process would be a futile endeavor, and would cause him irreparable injury, because "remaining incarcerated for

even a few weeks increases the risk that he will contract COVID-19."*Id.* at *3.

Similarly, in the case of a defendant incarcerated at MDC-Brooklyn, the court noted that

"[e]ven a few weeks' delay carries the risk of catastrophic health consequences for

McCarthy. Second, "given the brief duration of Defendant's remaining term of

imprisonment, the exhaustion requirement likely renders BOP incapable of granting

adequate relief." *McCarthy, supra*, 2020 WL 1698732 at *4. *United States v. Colvin*,

2020 WL 1613943 (D. Conn. Apr. 2, 2020) (finding exhaustion requirement futile when

defendant had only 11 days left of sentence); *See also United States v. Jose Marin*, 15-

cr-00252-PKC-RML-8 (E.D.N.Y. Mar. 30, 2020) (minute order granting assented-to

emergency motion to reduce sentence despite the fact that defendant has not exhausted

his administrative remedies);*United States v. Powell*, No. 1:94-cr-316(ESH), ECF No.

98 (D.D.C. Mar. 28, 2020) (finding administrative exhaustion futile, waiving §

3582(c)(1)(A)'s exhaustion requirement, and granting unopposed motion for

compassionate release in light of COVID-19 pandemic and defendant's underlying

health issues where defendant has only three months left of his sentence); In addition, at

least one court has found waiver even when the client's release date was far in the

future. *See., e.g., United States v. Zuckerman*, 2020 WL 1659880 at *4 (S.D.N.Y. Apr.

3, 2020) (granting compassionate release, and finding there was justification for waiving

the 30-day exhaustion requirement, noting "[a]lthough Zuckerman's original release

date may be far off, the threat of COVID-19 is at his doorstep.").

   The Bureau of Prisons has known for months of the impending COVID-19 crisis,

creating a further reason to excuse Mr. Kellem's failure to exhaust all administrative remedies.

As of April 14, Warden Spaulding of the Federal Medical Center, Devens, recently

acknowledged to prisoners and staff that it is not question of "if" confirmed cases will

appear among prisoners and staff, but "when." See, Grinis et al v. Spaulding et al, complaint

no. 1:20-cv-10738-GAO, ¶9. The BOP has had ample opportunity to adequately prepare FCI

Devens for this emerging health crisis, which would have obviated the need for Mr. Kellem's

emergency compassionate release petition.  Because the BOP was on notice of the potential

dangers to inmates like him, Mr. Kellem should not be required to wait while the BOP takes

additional time addressing his administrative request. *See Basciano*, 369 F. Supp. 2d at 349

(despite failure to exhaust administrative remedies, because "the BOP ha[d] not addressed [his]

request for relief in a timely fashion," despite "ample opportunity" to do so, the court found that

"[t]he administrative appeals process would thus, in the circumstances of this case, be an empty

formality that would risk exposing Basciano to irreparable harm"). Mr. Kellem should not be

forced to bear the brunt of the facility's failure to adequately prepare for COVID-19. In these

extraordinary circumstances, the Court should waive the administrative exhaustion requirement in

§ 3582.  This is particularly so when it appears unclear whether or not the institution is doing any,

or any additional, testing in order to contain the spread of the virus.

Here, while the 30-day period since the warden's receipt of Mr. Kellem's request

for compassionate release due to the threat of coronavirus infection has not yet passed,

this Court can construe the exhaustion requirement as futile given the urgency of this

national emergency and rapid spread of the pandemic and the demonstrable inadequacy

of preventative activity by the Devens administration to thwart the arrival or prevent the

spread of COVID-19 at FCI Devens.[26]

### III.    A Sentencing Reduction is Warranted Under the 3553(a) Factors.

---

[26] If this Court holds that it cannot waive the 30-day exhaustion requirement, it may also
grant this motion immediately after the 30 days has elapsed, i.e. on May 2, 2020. *See,
e.g., United States v. Spears*, 2019 WL 5190877 at * 3 (D. Or. Oct. 15, 2019) (noting that
Spears presented his request to the BOP on September 13, 2019, the same day he filed his
motion with the Court. The 30-day period expired October 13, 2019. The Court granted
the motion on October 15, 2019, the first business day after October 13, 2019).

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in §3553(a) to determine whether a sentencing reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). As currently scheduled, the BOP expects to release Mr. Kellem on  January 6, 2023.

As detailed in Defendant's Pre-Sentence Report, Mr. Kellem's history and characteristics further support this request. He has no history of violence and he fell into the lowest criminal history category allowed by the sentencing guidelines – Criminal History Category I. As demonstrated through the many letters of support submitted prior to his sentencing and the overwhelming number of family and friends who came to Court to support him, Mr. Kellem has a strong support network to help him assimilate into society. While the factors that led the Court to impose a forty-two month incarcerative sentence at the time were explained by the Court, the situation has drastically changed. No one could foresee a pandemic which could cause a defendant's sentence potentially change from one of incarceration to one of severe ill health or death. A sentence reduction is warranted under the § 3553(a) factors.

## CONCLUSION

For the foregoing reasons, Mr. Kellem respectfully requests that the Court grant a reduction in his sentence to time served, followed by a 5 years of supervised release, during which he may reside with his aunt, work virtually from her home or at Pilot Inc., premises and begin to repay the owed restitution. Alternatively, this Court could impose a reduced sentence of time served and as a condition of supervised release that he be confined to his home for a six month period of time.

Respectfully submitted,

JEFFREY KELLEM,
By His Attorney,

*/s/ James B. Krasnoo*
James B. Krasnoo BBO #279300
Krasnoo, Klehm and Falkner
28 Andover Street
Suite 240
Andover, MA 01810
978-475-9955

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 24, 2020.

*/s/ James B. Krasnoo*

James B. Krasnoo